## STELLA WOJCIK
vs.
## METROPOLITAN LIFE INSURANCE COMPANY

Superior Court      New Haven County      File #52251

Present:  Hon. PATRICK B. O'SULLIVAN, Judge.

Bertrand B. Salzman,      Attorney for the Plaintiff.

Wiggin & Dana,      Attorneys for the Defendant.

**MEMORANDUM FILED JANUARY 13, 1938.**    124 Conn. 532

O'SULLIVAN, J.   Upon the right of way of the New Haven Railroad as it extends through West Haven are four main-line tracks, two for traffic to the east, two for that to the west.   The use of the local stations was discontinued in 1932 and since then trains no longer stop at West Haven to receive or discharge passengers.

On October 17, 1936, at seven o'clock in the morning, Joseph Wojcik, aged 54, was found dead near the abandoned stations.   His body had been severed in two at the shoulders. The torso and legs were stretched between and at right angles to the rails of the inner east-bound track, the feet being near the southerly of the two rails.   His head lay beyond the northerly rail between the inner tracks in a line with his body. From the place where he was found, the right of way to the west is straight for one-half mile.

On May 25, 1927, the defendant had issued and delivered to the deceased a policy of life insurance to which was attached

an accidental death benefit contract. By the terms of the latter, it was agreed that there would be paid to the plaintiff, the wife of the deceased and the named beneficiary, the sum of $5,000. "upon receipt of due proof of the death of the insured, as the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means, provided that death shall not have been the result of self-destruction, whether sane or insane."

This action has been instituted to recover on the supplementary contract, the defendant having already satisfied its obligation arising under the ordinary life policy. The complaint alleges that the insured sustained bodily injuries through external, violent and accidental means, resulting directly and independently of all other causes in his death. The general denial filed by the defendant prompted the plaintiff to claim persistently during the trial that the failure to plea specially should preclude the insurer from offering evidence tending to establish self-destruction and should now prevent the Court from considering it. Her position is that where an exception to a risk is relied upon, the insurer must plead and prove it. Lounsbury vs. Protection Ins. Co., 8 Conn. 459; Fogarty vs. Fidelity & Casualty Co., 120 Conn. 296.

The provision as to self-destruction contemplates two possibilities; one, where the insured kills himself while insane; the other, while sane. The former results in accidental death if the insanity is of a nature to render the insured incapable of the premeditation an accident negates. The insurer must plead self-destruction, if it has excepted such a death from the risk. However, this is of no present moment as the case was not tried upon any theory suggestive of the insanity of the insured, nor was any claim to that effect advanced by the plaintiff.

The so-called exception of self-destruction, while sane, is in fact no exception at all. The contract is not one covering all deaths save suicide. Were it of this character, the insurer would necessarily be compelled to plead the exception, if it intended to rely upon it. Fogarty vs. Fidelity & Casualty Co., supra. However, the ambit of the risk was accidental death, that is, death occurring unexpectedly or without design. Morris vs. Platt, 32 Conn. 75, 85; Linnane vs. Aetna Brewing Co., 91 Conn. 158, 162. By force of its own definition, the term "accidental death" excludes intentional self-destruction, or its synonym, suicide. As an exception removes a risk which

would otherwise properly fall within the coverage of the contract, it is legally and logically impossible to except suicide from the risk of accidental death. As well might one try to pluck from a tree an apple that never was on it. Hence, the defendant was under no obligation to plead otherwise than as it did. The plaintiff assumed the burden of proving that the sole proximate cause of Wojcik's death was an accident. This carries with it the task of negativing suicide. **O'Meara vs. Columbian National Life Ins. Co., 119 Conn. 641; Rinaldi vs. Prudential Ins. Co., 118 Conn. 419; McAlpine vs. Fidelity & Casualty Co., 134 Minn. 192, 158 N.W. 967; Wigmore on Evidence (2d ed.) §2510.**

On this phase of the case, then, the question is whether the facts established by evidence and the inferences reasonably drawn therefrom are such that reasonable men fairly exercising their judgment could conclude that death was accidental, and not suicidal. **Rinaldi vs. Prudential Ins. Co., supra, at page 425.** The problem is thus limited because the manner in which Wojcik was killed disposes of any need of discussing whether his death was the result of external and violent means, for obviously it was.

The deceased and the plaintiff were married in 1925. Although they had no children, they lived happily with each other. A grocery store which they operated near their home in Hamden provided ample means for their livelihood. During August, 1936, Wojcik entered a hospital where an operation was performed to repair a double hernia with which he had been troubled. The surgeon discharged him about September 15th at which time he was in good physical condition, normal spirits, and fine health. Towards the latter part of that month, or the early part of the next, he began to drink heavily. On October 5th, with about $40. in his pocket, he left for New Haven to look over some second-hand trucks. As he did not come that evening, his wife, becoming worried, reported his absence on the following morning to the Hamden police. Later in the day he returned. In spite of his wife's entreaties to remain, he left the home during the evening. He spent the nights of October 6th, 7th, 8th and 12th in a cheap hotel in New Haven. During this period, he continued to drink, his condition varying from intoxication to drunkenness. Where he spent the next four days does not appear, but about 5 p.m. on October 16th he walked into a barber shop located in the neighborhood of his home. He was sober and

in good spirits. The shop was one he had been accustomed to patronize. He engaged in general conversation with the proprietor while having his hair trimmed and being shaved. There is no further evidence as to his actions. From midnight until the following noon rain fell. When the body of the deceased was found, his clothes were soaking wet.

The deceased wore spectacles, for he was near-sighted, and these, with the glass unbroken, were in place upon his head. There was a laceration on his upper lip while on his forehead was an area of ecchymosis. In his pockets were some small coins, a notebook, a hotel key and a package containing nine feet of new window-sash cord.

A few days after the trial had been concluded, the plaintiff moved for permission to present further testimony, which over the defendant's objection, was granted. At the hearing subsequently held it was established that along the northerly side of the railroad tracks, about a third of a mile west of the abandoned stations, there is a Polish settlement to which the deceased had been known to go to visit his friends and countrymen. Further evidence submitted at this time concerning the use of the right of way by pedestrians, and the existence of a near-by tavern, has no weight, in the absence of some proof that the deceased had knowledge thereof.

To meet death accidentally requires one to find a lack of intention to suffer death. Manifestly, the deceased cannot relate what was in his mind and to find that out, the trier is necessarily compelled to rely on circumstantial evidence.

Men ordinarily commit suicide for some reason, usually magnified beyond all proportion. This instant case is notable by the absence of such a motive. Wojcik apparently had neither family nor financial troubles. He enjoyed good health. His disposition was cheerful and never had he been known to have suggested suicide. Only a matter of hours before he died, he was shaved and had his hair trimmed, hardly the act of one about to kill himself. These are indeed forceful considerations which point to an accidental occurrence.

However, the most impressive fact of all destroys the effect of the foregoing. The deceased was lying on the rail as the train approached. This seems reasonably obvious because of the lack of damage to the torso and legs. Not even a bruise was on them. Had he been standing or walking when the tragedy occurred, the impact with the engine would unques-

tionably have mutilated his body and legs to some visible extent. We know, then, that he was lying prone upon the rail. How he got there suggests at least three possibilities. While insensible, he could have been placed there by an evildoer; he could have lain there deliberately; or he could have stumbled and, in falling, stunned himself and thus been rendered helpless before the oncoming danger. But it would be sheer speculation to pick out any one of the enumerated possibilities. The impressive fact is that he actually was lying on the track. When, to this, one considers the rope he carried in his pocket and the report of the medical examiner whose conclusion of suicide, under **Branford Trust Co. vs. Prudential Ins. Co., 102 Conn. 481,** is entitled to consideration, the weight of the plaintiff's case is offset and more than balanced by that of the defendant.

The plaintiff has urged that, if the evidence is in equipose, the presumption against suicide must be the deciding factor in her favor. That there is a presumption of accidental death is unquestioned. **Watkins vs. Prudential Ins. Co., 315 Pa. 497.** But it is without probative value and disappears upon the presentation of substantial countervailing evidence. Of course it is true that even after it has exhausted itself by carrying the plaintiff past a non-suit and to the point where countervailing proof is submitted, the facts and circumstances which gave rise to it still remain and afford a basis for a like inference by the trier. **O'Dea vs. Amodeo, 118 Conn. 58;** see **95 A.L.R. 892.** In other words, the facts which furnish the foundation of the presumption are entitled to count as evidence, and all fair inferences may be drawn therefrom, although the additional artificial effect bestowed upon them by a rule of law cannot be regarded as either contributing evidence or possessing probative quality. **Vincent vs. Mutual Reserve Fund Life Ass'n, 77 Conn. 281.** Stated succinctly, the facts on which the presumption arises are mankind's instinctive love of life and fear of death. Thus, the trier has the right to bear in mind, after the presumption has vanished, the fact that to the average human being life is more attractive than death, and, on an even balance of the evidence as between accidental death and suicide, the probabilities against the latter. **Watkins vs. Prudential Ins. Co., supra.** He may consider the abnormality of suicide, not weighed down by the artificial additional effect of a presumption. **Jefferson Standard Life Ins. Co. vs. Clemmer, 79 F. (2d) 724; Wigmore on Evidence (2d ed.) §2491.**

Yet even then, I cannot feel satisfied that Wojcik's death was accidental. Neither am I satisfied it was suicidal. The case furnished a most apt illustration of the importance of the burden of proof. As the plaintiff, upon whom it rests, has failed to prove that the deceased died accidentally, judgment must enter for the defendant.

I venture to make one final observation which, of course, has no binding effect though I wish that it might, because, did authority so warrant, it would furnish a happy means of solving a most distressing problem.

The burden of proof—a legal procedure—has determined the result. Had it rested on the defendant, the outcome would have been the reverse of what it is. Under these circumstances, where no mortal will ever know definitely whether this was an accident or a suicide, should not the insurer, even in the face of a supporting judgment in its favor, concede that fairness requires a substantial payment be made to the beneficiary? My own notion of justice, such as it is, suggests that it should.